Amrita **MADRAY**, Plaintiff,

v.

**LONG ISLAND UNIVERSITY and Jeffrey Kane as aider and abettor, Defendants.**

**No. 10–CV–3841 (ADS)(WDW).**

United States District Court,
E.D. New York.

June 2, 2011.

The Law Offices of Joseph Ruotolo, LLC, by Joseph Carmine Ruotolo, Esq., of Counsel, Babylon, NY, for Plaintiff.

Law Office of Robert Jacovetti, P.C. by Robert Charles Jacovetti, Esq., of Counsel, Rockville Centre, NY, for Plaintiff.

Long Island University, Office of the General Counsel by Catherine Murphy, Esq., Of Counsel, Brookville, NY, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Amrita Madray ("Madray" or "the Plaintiff") commenced this action against her former employer Long Island University ("LIU") and Dr. Jeffrey Kane, Vice President of Academic Affairs ("Dr. Kane" and together with LIU "the Defendants") alleging discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"). Presently before the Court is the Plaintiff's motion for leave to amend her complaint. The proposed amended complaint seeks to add Jeffrey Kane's name in the introductory paragraph and include the date of the Plaintiff's resignation from LIU. For the reasons that follow, the Plaintiff's motion to amend her complaint is granted.

## I. BACKGROUND

Plaintiff Amrita Madray, a female of Guyanese descent, was employed as an instructor, and later an assistant professor, in the library of the C.W. Post Campus, which is a part of Long Island University ("LIU") from approximately 2001 until her resignation on March 20, 2009. The following facts underlying Madray's claims are primarily drawn from the original complaint, the first amended complaint, the proposed second amended complaint, and the documents referenced in the complaints that were attached to the parties' motion papers. For the purposes of this motion, these facts are assumed to be true and construed in the light most favorable to the Plaintiff.

From 2001 to 2002, while employed as an instructor in the C.W. Post Library, Madray created a faculty plagiarism website that was subsequently made available in all LIU libraries. Although the details of this website and how it operates are not set forth in the complaint, the Court notes that the parties classify Madray's plagiarism website as a "digital product." At LIU's request, Madray created another digital product in the form of a similar plagiarism website for the student body. In 2003, Madray presented her plagiarism website to the faculty of the Brooklyn Campus, which is also a part of LIU, and, later that year, LIU promoted Madray to the position of assistant professor. Madray presented an updated version of her plagiarism website several times, to groups such as the C.W. Post Marketing Department, the Adelphi University Faculty Department, and the Florida Library Association.

In January 2007, Madray submitted her first application for academic tenure. In April of 2007, defendant Dr. Jeffery Kane, Vice President of Academic Affairs, informed Madray, without explanation, that LIU had denied her tenure application. After continuing to develop her scholastic credentials on the topic of plagiarism, in January 2008, Madray submitted a second application for academic tenure. Despite recommendations of approval in support of

her second tenure application from the C.W. Post Library Committee, the C.W. Post Faculty Personnel Committee, and Dean Donald Unagarelli, LIU denied her second tenure application. On April 23, 2008, Dr. Kane notified Madray of the second denial and informed her that LIU would terminate her employment on August 31, 2008.

As a result, in June 2008, Madray filed a grievance with her union, contesting the denial of tenure and termination of her employment. In response, Dr. Kane offered Madray a two-year extension of discretionary employment, at the end of which, Madray could submit, and LIU would consider, a third tenure application. Dr. Kane made this offer in a letter dated August 8, 2008 (the "August 8, 2008 letter"). In the August 8, 2008 letter, Dr. Kane cited as one of the reasons that LIU denied Madray's second application for tenure, an inability to properly evaluate digital products, as a form of scholarly work. Dr. Kane further stated that, in order to properly consider Madray's third tenure application, it would be necessary for the school to develop a method for assessing "digital products", and that the "[t]he C.W. Post Library Personnel Committee and the Dean [Unagarelli] have agreed to work with the office of Academic Affairs to develop a method of assessing digital products . . . ." (First Am. Compl., ¶ 31.)

Madray understood the August 8, 2008 letter from Dr. Kane to state that, without the development of a method to evaluate her "digital product", LIU would deny her third application for tenure and terminate her employment at the end of the discretionary period on August 31, 2010. Consistent with the statement in the letter that the LIU Office of Academic Affairs would work with the C.W. Post Library Personnel Committee and Dean Unagarelli

to develop a method of assessment, from August 2008 until February 2009, Madray and Dean Unagarelli made a number of attempts to contact Dr. Kane to discuss the development of such a method. However, Dr. Kane never responded to their attempts to contact him.

On February 23, 2009, Madray filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") asserting that she had been denied tenure on the basis of her race, gender, and national origin. Then, on March 6, 2009, Madray sent a letter to Dean Unagarelli stating her intent to resign her position effective March 20, 2009. In her resignation letter, Madray stated that the reason for her resignation was Dr. Kane's refusal to meet with the C.W. Post Library Personnel Committee, Dean Unagarelli, or herself to develop a method for assessing her digital products. Ultimately, LIU did not implement a method of assessing digital scholarly products for tenure consideration in the 2009–2010 year.

On August 20, 2010, Madray commenced this lawsuit by filing a complaint against LIU and Dr. Kane for discrimination and retaliation under Title VII and NYSHRL based on the denials of tenure and the termination of her employment. Subsequently, on September 16, 2010, before the Defendants filed a responsive pleading, Madray amended the complaint as a matter of right, changing minor statements of fact as well as adding the fifth and sixth causes of action against Dr. Kane directly for discrimination and retaliation under the NYSHRL.

Presently before the Court is Madray's opposed motion to file a second amended complaint pursuant to Fed.R.Civ.P. 15(a), which would make three changes to the first amended complaint. The first proposed amendment is the inclusion of a

reference to Madray's EEOC right to sue letter, dated May 25, 2010, as "Exhibit A" to the complaint. The Defendants do not oppose this amendment. Second, although Dr. Kane is already listed as an "aider and abettor" in the caption of the complaint, Madray seeks to amend the introductory paragraph of the complaint to specifically state that she is suing Dr. Kane in his capacity as an alleged aider and abettor. The Defendants oppose this amendment on the grounds of futility, namely, that an individual cannot be sued in their personal or official capacity as an aider and abettor under Title VII.

Finally, Madray proposes to add one sentence to the complaint in paragraph 35, stating that she resigned from her position on March 20, 2009. Because the first amended complaint uses the word "termination" to describe Madray's departure from LIU, this proposed amendment would change the nature of her claim from one for termination, to one for constructive discharge. The Defendants contend that this amendment would be futile because the proposed second amended complaint, even with the amendment, does not state a claim for constructive discharge.

## II. DISCUSSION

### A. Standard of Review

A motion to amend is governed by Fed. R.Civ.P. Rule 15(a), which states that leave to amend "shall be freely given when justice so requires." The United States Supreme Court, in interpreting Rule 15(a), stated:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits. In the absence of any apparent or declared reason such as undue delay, bad faith or dilatory motive on the part of the movant, repeated

failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. the leave sought should, as the rules require, be freely given.

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Asset Mgmt. Assocs. of N.Y., Inc. v. Emerson Telcom. Prods. LLC,* 395 Fed.Appx. 752, 753 (2d Cir.2010).

The Defendants do not argue that the Plaintiff made this motion after undue delay or in bad faith, nor do the Defendants contend that they would be prejudiced in anyway by the allowance of the amendments. Rather, the Defendants oppose the motion for leave to amend on the sole ground that the proposed amendments are futile. Accordingly, the Court limits its analysis to the issue of the possible futility of the proposed amendments.

■ A proposed amendment is futile if the proposed claim could not withstand a Fed.R.Civ.P. 12(b)(6) motion to dismiss. *Lucente v. IBM Corp.,* 310 F.3d 243, 258 (2d Cir.2002). A claim can only withstand a Rule 12(b)(6) motion if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In deciding whether a complaint meets this threshold, the Court is required to accept the material facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868, 884–87 (2009).

### B. As to the Addition of Dr. Jeffery Kane to the Introductory Paragraph.

■ The Plaintiff first seeks to amend the introductory paragraph of the com-

plaint, which currently states that the Plaintiff's complaint is "against defendant LONG ISLAND UNIVERSITY", to include "and JEFFREY KANE as aider and abettor." As previously noted, Dr. Kane's name already appears in the caption of the complaint with the qualifier "as aider and abettor," as well as in the fifth and sixth claims for relief, which specifically allege his involvement in the discrimination and retaliation against the Plaintiff under NYSHRL. As an initial matter, because the Defendants only make a passing reference to the Plaintiff's failure to allege facts implicating Dr. Kane in the alleged constructive discharge, without any substantive argument, the Court will not address it here.

Rather, the Defendants primarily oppose the addition of Dr. Kane's name in the introductory paragraph as futile because Title VII claims cannot be maintained against individual defendants. The Plaintiff does not respond to this argument, although both parties agree that the addition of Dr. Kane's name and alleged role as an "aider and abettor" in the introductory paragraph does not add a new claim.

■ The Defendants correctly note that the Plaintiff cannot hold Dr. Kane personally liable for discrimination or retaliation under Title VII. *See Wrighten v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000) (affirming dismissal of Title VII claims against individual defendants, "because individuals are not subject to liability under Title VII"). However, the Plaintiff has not asserted claims against Dr. Kane under Title VII. Instead, the Plaintiff names Dr. Kane in the fifth and sixth causes of action for discrimination and retaliation under the NYSHRL, which permit individual liability, *see Feingold v. New York,* 366 F.3d 138, 157–58 (2d Cir.2004) ("A supervisor is an 'employer' for purposes of establishing

liability under the NYSHRL if that supervisor actually participates in the conduct giving rise to [the] discrimination.") (internal quotations omitted), and for aider and abettor liability, *see id.* ("[T]he NYSHRL states that it shall be an unlawful discriminatory practice 'for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so.'") (citing N.Y. Exec. Law § 296(6)). Insofar as the proposed amendment does not add a new claim, the proposed amendment is, at most, a cosmetic change to the introductory paragraph of the complaint, and therefore permitting its inclusion would not be futile.

### C. As to the Proposed Addition of Facts Alleging a Constructive Discharge

■ Next, the Court turns to the proposed amendment to include the date of the Plaintiff's resignation from LIU in paragraph 35 of the proposed second amended complaint. In the initial and first amended complaints, the Plaintiff stated that LIU discriminated and retaliated against her in violation of Title VII and the NYSHRL by denying her tenure and terminating her employment. The Plaintiff now seeks leave to amend her complaint to replace the incorrect assertion that LIU terminated her, with additional facts to establish a constructive discharge.

■ The Court considers in tandem Title VII and NYSHRL discrimination and retaliation claims. *See Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1177 (2d Cir.1996) ("We consider [plaintiff's] state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York Human Rights Law"). One element of the prima facie case for both discrimination and retaliation claims under the Title VII and the NYSHRL is the

existence of an adverse employment action. *See Ruiz v. County of Rockland,* 609 F.3d 486, 491–92 (2d Cir.2010); *see also Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 608 (2d Cir.2006). The Plaintiff has alleged two adverse employment actions: the denial of tenure and the termination of her employment.

The Court initially notes that plausibly alleging an adverse employment action is only one of a number of elements required to adequately state a claim for discrimination or retaliation. Here, the Defendants have not filed a motion to dismiss addressing the sufficiency of the Plaintiff's factual allegations for the discrimination and retaliation claims as a whole. The Court will not *sua sponte* address matters that are not properly before it, and to which the Plaintiff has not had an opportunity to respond. Furthermore, the Defendants argue that the proposed amendment would be futile because the underlying discrimination claims in the complaint are untimely, and the Plaintiff has failed to exhaust her administrative remedies on the constructive discharge claim.

However, the Court does not have sufficient information to resolve these arguments on the present motion because both of these objections require an analysis of the Plaintiff's EEOC complaint, and the Court was presented with two materially different versions of this document. Because there are issues of fact with respect to which is the correct version of the EEOC complaint, and neither party sought to provide an explanation, the Court declines to address on the present motion whether the discrimination claims were untimely or whether the Plaintiff has exhausted her administrative remedies. Therefore, the Court limits its analysis to whether the proposed amendment plausibly states a constructive discharge claim, and presumes, only for the purposes of

this motion, that the Plaintiff properly states the other elements of the discrimination and retaliation causes of action.

The Supreme Court has held that a constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action under Title VII. *Pennsylvania State Police v. Suders,* 542 U.S. 129, 148, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *see also Fitzgerald v. Henderson,* 251 F.3d 345, 357 (2d Cir.2001) (holding that a plaintiff who did not use the term constructive discharge in the complaint nevertheless raised a question of an intolerable work conditions to preclude summary judgment by identifying continued, deliberate and bad faith actions that led to her resignation). Here, the Plaintiff's proposed amendment would change the nature of her allegation of discriminatory and retaliatory termination to one of constructive discharge.

For a court to consider constructive discharge a plaintiff must show that the employer "intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Terry v. Ashcroft,* 336 F.3d 128, 151–52 (2d Cir.2003) (holding that allegations of constructive discharge, "viewed as a whole, [must be] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign"). "Whether working conditions are sufficiently intolerable to constitute a constructive discharge 'is assessed objectively by reference to a reasonable person in the employee's position.'" *Borski v. Staten Island Rapid Transit,* 413 Fed.Appx. 409, 411 (2d Cir.2011) (quoting *Petrosino v. Bell Atl.,* 385 F.3d 210, 230 (2d Cir.2004)).

The standard for constructive discharge is a demanding one because it "cannot be proven merely by evidence that an employee ... preferred not to continue

working for that employer ... [or that] the employee's working conditions were difficult or unpleasant." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993). However, an employer's actions or statements which induce the involuntary resignation, either alone or in combination with other adverse conditions, can constitute intolerable working conditions for the purposes of establishing constructive discharge. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir.1987) (reversing lower court's grant of summary judgment dismissing a plaintiff's constructive discharge claim because the employee sufficiently raised factual issues by presenting evidence of the employer's statement that "he would be fired at the end of the 90–day probationary period no matter what he did to improve his allegedly deficient performance"); *Borrero v. Am. Express Bank*, 533 F.Supp.2d 429, 441 (S.D.N.Y.2008) (holding that an employee, who was told she would be terminated at the conclusion of her probationary period, stated sufficient facts to preclude summary judgment of her constructive discharge claim by presenting evidence that suggested a reasonable person in her position would have believed her termination was a "foregone conclusion"); *McCalla v. SUNY Downstate Med. Ctr.*, No. 03–CV–2633, 2006 WL 1662635, at *5 (E.D.N.Y. June 8, 2006) (denying a motion to dismiss a Title VII claim because the plaintiff plausibly alleged constructive discharge by presenting evidence that he was forced to resign after he was told that "he would be fired no matter what happened").

██ In analyzing a claim of constructive discharge, "the effect of a number of adverse conditions in the workplace is cumulative". *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir.1996). In the instant case, although the Plaintiff had a substantial amount of time remaining in her discretionary employment, she alleges

that under the following set of circumstances, which the Court accepts as true for the purposes of this motion, a reasonable person in her position would have believed their termination was a foregone conclusion.

Although LIU had promoted the Plaintiff to assistant professor, the Plaintiff alleges that for discriminatory purposes, LIU denied her application for tenure twice, in April 2007 and 2008. These denials were made by LIU despite recommendations of approval from Dean Unagarelli, the C.W. Post Library and Faculty Personnel Committee. Although the Plaintiff was subsequently offered a two-year discretionary employment period, the Defendants informed the Plaintiff that her employment would terminate on August 31, 2010 unless she was successful in a third application for tenure. According to the Plaintiff, it was her understanding from Dr. Kane's statements in the August 8, 2008 letter that without the development of a proper assessment process for her scholarly work, she would not be granted tenure at the end of her discretionary employment and would therefore be terminated.

During the first six months of her discretionary employment, the Plaintiff alleges that she and Dean Unagarelli reached out to Dr. Kane on a number of occasions to discuss creating the digital products assessment method, to no avail. Although the Defendants contend that Dr. Kane had no obligation to meet with the Plaintiff, they do not address the implication of Dr. Kane's alleged failure to meet with Dean Unagarelli. According to the Plaintiff, this apparent refusal by Dr. Kane to even discuss a plan for the development of a method to evaluate the Plaintiff's scholarly work for her third tenure consideration was further evidence of discrimination. Along with the past two denials of tenure,

the Plaintiff was lead to believe that there was nothing she could do that would enable her to obtain tenure at the end of her discretionary period. As a result, the Plaintiff felt that she would be terminated on August 31, 2010 regardless of the merits of her work, and therefore she resigned.

While there is a high threshold for establishing a constructive discharge claim, proposed amendments are construed liberally. Viewing the facts in a light most favorable to the Plaintiff, the Court finds that she has plausibly alleged that a reasonable person in her position would have felt that they had no other alternative than to resign, resulting in a constructive discharge. Accordingly, because the proposed amendment plausibly states a claim for constructive discharge, it is not futile to grant the Plaintiff leave to amend in that regard.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that the Plaintiff's motion for leave to serve an amended complaint in the manner requested is **GRANTED,** and it is further

**ORDERED,** that the Plaintiff is directed to serve the amended complaint within ten days of the date of this order.

**SO ORDERED.**